No. 25-10923

# In the United States Court of Appeals for the Fifth Circuit

**CASSANDRA JOHNSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF DECEDENT TRELYNN D'MAUN WORMLEY; ARYANNA STAFFORD, AS NEXT FRIEND OF M.P., A MINOR**

*Plaintiffs–Appellants*,

v.

**TARRANT COUNTY, TEXAS; KEEFE GROUP, L.L.C.; KEEFE COMMISSARY NETWORK, L.L.C.,**

*Defendants–Appellees*.

On Appeal from the United States District Court
for the Northern District of Texas

Hon. Reed O'Connor

Case No. 24-cv-00682-O

## PLAINTIFFS–APPELLANTS' OPENING BRIEF

Kelly Holt Rodriguez
*Counsel of Record*
JONES DAY
90 S. 7th Street
Suite 4950
Minneapolis, MN 55402
kholt@jonesday.com

Jason Burnette
JONES DAY
1221 Peachtree Street, N.E. Suite 400
Atlanta, GA 30361-3053
jtburnette@jonesday.com

*Counsel for Plaintiffs–Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-10923

**CASSANDRA JOHNSON, ET AL.**
*Plaintiffs–Appellants*,
v.
**TARRANT COUNTY, TEXAS ET AL.,**
*Defendants–Appellees*.

The undersigned counsel of record certifies that the following listed persons and entities (other than governmental parties) as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Cassandra Johnson, *Plaintiff*

Aryanna Stafford, *Plaintiff*

M.P., *Minor Child of Plaintiff Aryanna Stafford and Decedent Trelynn D'Maun Wormley*

The Estate of Trelynn D'Maun Wormley, *Estate of Decedent*

Kelly Holt Rodriguez, *Counsel for Plaintiffs*

Jason Burnette, *Counsel for Plaintiffs*

Jones Day, *Counsel for Plaintiffs*

Keefe Commissary Network, LLC, *Defendant*

Keefe Group, LLC, *Defendant*

TKC Holdings, Inc., *Affiliate of Defendants Keefe Group, LLC, and Keefe Commissary Network, LLC*

Stephen Andrew Lund, *Counsel for Defendant Tarrant County*

Katherine E. Owens, *Counsel for Defendant Tarrant County*

Joshua J. Bennett, *Counsel for Defendants Keefe Group, LLC, and Keefe Commissary Network, LLC*

Baker & Hostetler, LLP, *Counsel for Defendants Keefe Group, LLC, and Keefe Commissary Network, LLC*

Kelly Marie Frechette, *Former Counsel for Defendants Keefe Group, LLC, and Keefe Commissary Network, LLC*

Stacey Cho Hernandez, *Former Counsel for Defendants Keefe Group, LLC, and Keefe Commissary Network, LLC*

Monica Little Goff, *Former Counsel for Defendants Keefe Group, LLC, and Keefe Commissary Network, LLC*

Carter Arnett PLLC, *Former Counsel for Defendants Keefe Group, LLC, and Keefe Commissary Network, LLC*

Alizabeth Adam Guillot, *Former Counsel for Plaintiffs*

Carl Lenford Evans, Jr., *Former Counsel for Plaintiffs*

David A. Dekle, *Former Counsel for Plaintiffs*

Paul Ashley Grinke, *Former Counsel for Plaintiffs*

Stephen Michael Bergren, *Former Counsel for Plaintiffs*

Cozen O'Connor, *Former Counsel for Plaintiffs*

McCathern Shokouhi Evans PLLC, *Former Counsel for Plaintiffs*

Ben Crump Law PLLC, *Former Counsel for Plaintiffs*

McCathern PLLC, *Former Counsel for Plaintiffs*

/s/ *Kelly Holt Rodriguez*
Kelly Holt Rodriguez
*Attorney of record for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. *See* Fed. R. App. P. 34; 5th Cir. R. 28.2.3. The order under review raises legally and practically significant questions regarding the scope of liability for preventable in-custody deaths on the part of governments and private third-party contractors. Oral argument will assist this Court in answering those questions.

# TABLE OF CONTENTS

**Page**


CERTIFICATE OF INTERESTED PERSONS ..................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ iv

TABLE OF AUTHORITIES ............................................................................ vii

INTRODUCTION ............................................................................................. 1

JURISDICTIONAL STATEMENT ..................................................................... 2

STATEMENT OF ISSUES ................................................................................. 3

STATEMENT OF THE CASE ............................................................................ 4

I. FACTUAL BACKGROUND. ............................................................ 4

A. In-Custody Deaths in Tarrant County ....................................... 4

B. Tarrant County's Responses. .................................................... 6

II. PROCEDURAL HISTORY. ............................................................... 7

SUMMARY OF ARGUMENT ......................................................................... 10

STANDARD OF REVIEW ............................................................................... 11

ARGUMENT ................................................................................................... 12

I. PLAINTIFFS PLAUSIBLY PLEADED TARRANT COUNTY'S *DE FACTO* POLICY OF ALLOWING DRUGS INTO ITS JAIL. ........................................................................ 12

A. The Complaint Alleges Sufficient Facts To Support The Inference Of A *De Facto* Policy Of Allowing Illegal Drugs Into Tarrant County Jail. ............................................. 13

B. The District Court's Contrary Conclusion Was Based On An Improperly Heightened Standard And Disregarded Binding Precedent. ............................................................ 18

II. PLAINTIFFS PLAUSIBLY PLEADED THAT KEEFE NEGLIGENTLY SUPERVISED ITS EMPLOYEES. ....................... 24

A. It Was Foreseeable That, Absent Adequate Supervision, Keefe Employees Would Smuggle Dangerous Contraband Into The Jail. ....................................................... 25

**TABLE OF CONTENTS**
(continued)

**Page**

B. The District Court Improperly Conflated Distinct Theories Of Liability ........ 27

CONCLUSION ........ 30

CERTIFICATES OF COMPLIANCE AND SERVICE ........ 31

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Armadillo Hotel Grp., L.L.C. v. Harris*,
84 F.4th 623 (5th Cir. 2023) ........................................................11, 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................2

*Benfer v. City of Baytown, Texas*,
120 F.4th 1272 (5th Cir. 2024) ......................................................22, 23

*Black v. Smith Protective Servs., Inc.*,
No. 01-14-00969-CV, 2016 WL 5400565 (Tex. App. Sept. 23, 2016) ...........................................................................................24, 25

*Brown v. McClure*,
No. 01-19-00504-CV, 2021 WL 6119990 (Tex. App. Dec. 28, 2021) ...........................................................................................24, 29

*Dangerfield v. Ormsby*,
264 S.W.3d 904 (Tex. App. 2008)..................................................28

*Flagg v. Stryker Corp.*,
647 F. App'x 314 (5th Cir. 2016) ...................................................21

*Grandstaff v. City of Borger, Texas*,
767 F.2d 161 (5th Cir. 1985) .........................................................20

*Houser v. Smith*,
968 S.W.2d 542 (Tex. App. 1998)..................................................25

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*,
507 U.S. 163 (1993).........................................................................2, 18

*Montano v. Orange Cnty., Texas*,
842 F.3d 865 (5th Cir. 2016) ....................................................................passim

*Nixon v. Mr. Prop. Mgmt. Co*.,
690 S.W.2d 546 (Tex.1985)...........................................................................30

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001) ........................................................................14

*Prince-Rivers v. Fed. Express Ground*,
731 F. App'x 298 (5th Cir. 2018) (per curiam) ..............................................12

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc*.,
769 F.3d 313 (5th Cir. 2014) ...............................................................4, 12, 19

*Sanchez v. Young Cnty., Texas*,
956 F.3d 785 (5th Cir. 2020) .............................................................16, 17, 18

*Shepherd v. Dallas County*,
591 F.3d 445 (5th Cir. 2009) ........................................................................15

*Speer v. United States*,
512 F. Supp. 670 (N.D. Tex. 1981) ..............................................................29

*Stanfield v. Neubaum*,
494 S.W.3d 90 (Tex. 2016)...........................................................................30

*Travis v. City of Mesquite*,
830 S.W.2d 94 (Tex.1992).............................................................................30

*United States v. Lambright*,
320 F.3d 517 (5th Cir. 2003) (per curiam) ...............................................26, 27

*United States v. Scroggins*,
599 F.3d 433 (5th Cir. 2010) ........................................................................13

*Wrenn v. G.A.T.X. Logistics, Inc*.,
73 S.W.3d 489 (Tex. App. 2002)....................................................................24

**STATUTES**

28 U.S.C. § 1291 ........................................................................................ 3

28 U.S.C. § 1331 ........................................................................................ 2

28 U.S.C. § 1343 ........................................................................................ 2

28 U.S.C. § 1367 ........................................................................................ 2

42 U.S.C. § 1983 ........................................................................................ passim

**OTHER AUTHORITIES**

Letter of Marc Veasey, Member of Congress, to Kristen Clarke, United States Assistant Attorney General (May 23, 2024), http://veasey.house.gov/sites/evo-subsites/veasey.house.gov/files/evo-media-document/DoJ%20Letter%20Re%20Tarrant%20County%20Jail_Rep.%20Veasey.pdf ........................................ 5

## INTRODUCTION

On July 20, 2022, Trelynn D'Maun Wormley died of a fentanyl overdose while in custody in Tarrant County Jail awaiting trial. He is one of *145* individuals who have died in Tarrant County custody in recent years, a pattern of deaths not mirrored by other similarly-sized custody populations nationwide.

Like many of the individuals who have died in Tarrant County Jail, Mr. Wormley obtained drugs on which he fatally overdosed from an employee at the jail—in Mr. Wormley's case, from an employee of the jail's third-party commissary supplier, Keefe Commissary Network LLC. The problem of contraband in Tarrant County Jail was well known long before Mr. Wormley's death. Yet both before and after his death, Tarrant County has turned a blind eye to these problems. Every few years, it issues a memo about contraband entering the prison, but it takes no further steps to address the problem or stem the rising death toll. Even after an investigation following Mr. Wormley's death confirmed the scale of the problem, Tarrant County made no meaningful changes.

The district court dismissed this action by demanding evidence at the pleading stage. Although Plaintiffs alleged a shocking pattern of 145 in-custody deaths—including more than a dozen directly linked to drugs—and specific internal reports admitting that contraband flows freely into Tarrant County Jail, the district court held these allegations insufficient to plead a *de facto* policy. In doing so, the court applied a "similarity and specificity" standard so rigid that it effectively requires a plaintiff to

identify the exact same drug, smuggled by the exact same type of employee, resulting in the exact same medical outcome, before discovery has even commenced. This defies *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Similarly, the court immunized Defendant Keefe from liability for its own failure to supervise. The court held that because Plaintiffs did not allege Keefe knew this specific employee was a criminal prior to hiring her, Keefe had no duty to supervise her conduct once hired. This conflates negligent hiring with negligent supervision. Under Texas law, an employer who places employees in a high-security environment with the capacity to smuggle lethal contraband has a duty to supervise them. Moreover, as the third-party commissary supplier at a jail with a known problem with contraband, Keefe knew or should have known that there was a significant risk that its employees might bring drugs and other contraband into the jail. Keefe also had the ability to monitor what its employees brought into the jail—yet failed to do so, instead allowing its employee to smuggle in the drugs that caused Mr. Wormley's death. No more is needed to plead a negligence claim against Keefe.

For all these reasons, the district court's judgment should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' claims arise under federal law—specifically 42 U.S.C. § 1983. The district court had supplementary jurisdiction over Plaintiffs' state law claims under 28 U.S.C.

§ 1367.[1] The district court issued its Order dismissing Plaintiffs' claims on July 11, 2025. ROA.353-70. It issued a separate Final Judgment the same day. ROA.371. On August 8, 2025, Plaintiffs-Appellants timely filed a notice of appeal. ROA.372. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

**1.** Whether Plaintiffs plausibly alleged that Tarrant County had a *de facto* policy of allowing illegal drugs into its jail for purposes of pleading Tarrant County's Section 1983 liability by alleging numerous specific overdose deaths, statements of jail employees and inmates discussing the prevalence of drugs in the jail, investigatory results confirming the issue, and the County's lack of meaningful response to these issues?

**2.** Whether Plaintiffs sufficiently alleged that Keefe negligently supervised its employees, where Keefe knew or should have known of a risk its employees would bring dangerous drugs into the jail, had the ability to monitor what its employees brought into the jail, and failed to exercise that authority?

---

[1] The suit against Keefe was originally filed in Texas state court, but Keefe removed the action to federal court, where it was consolidated with Plaintiffs' case against Tarrant County. ROA.354-55.

# STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND.

### A. In-Custody Deaths in Tarrant County.

On July 20, 2022, Trelynn D'Maun Wormley died of a fentanyl overdose after being found unresponsive in his cell at Tarrant County Jail, where he was being held while awaiting trial. ROA.109.[2] Mr. Wormley had obtained the fentanyl from Aliyah Lyles, a Keefe Commissary Network LLC ("Keefe")[3] employee who worked at the Tarrant County Jail commissary. ROA.117.

Mr. Wormley's death was not an isolated incident. Instead, his death was one of 145 in-custody deaths in Tarrant County between 2017 and 2024, with many of those deaths involving drugs and/or known mental-health problems. ROA.111. At least 64 of those deaths were, like Mr. Wormley, in the custody of the Tarrant County Sheriff's Office. ROA.111. Specifically, Mr. Wormley's death was just one of at least *twelve* deaths known or suspected to be tied to drug use, not to mention at least three deaths that appear connected to withdrawal or detox from drugs. ROA.111-15. Moreover,

---

[2] Because this case is at the motion-to-dismiss stage, the facts in this brief are drawn from Plaintiffs' First Amended Complaint, ROA.108-133. For purposes of evaluating the district court's decision, the allegations in the Complaint must be taken as true. *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).

[3] Both Keefe Commissary Network LLC and its parent, Keefe Group LLC, are defendants in this case, and references to "Keefe" in this brief refer to both entities. Neither Keefe nor the district court below distinguished between the two entities for purposes of the motion to dismiss.

Mr. Wormley's death was just one of at least *thirteen* deaths by suicide or otherwise following known mental health concerns. *Id.*

This death toll is unusual, and it has caught the attention of numerous media outlets and at least one United States Congressman, Marc Veasey, who have highlighted the dangerous conditions in Tarrant County custody. ROA.115-16. Congressman Veasey, in particular, has called upon the federal government to investigate the "circumstances surrounding the escalating number of unnatural deaths" in Tarrant County Jail, which he noted "appear to be part of a pattern of negligence and mismanagement from the leadership of Tarrant County Jail." *Id.*[4]

As Congressman Veasey suggested, Tarrant County's unusual pattern of unnatural deaths reflects broader patterns at the jail. Despite purporting to have strict rules regarding contraband, for example, several incidents in recent years reflect that Tarrant County's *de facto* policy is to allow contraband, including illegal drugs, into the jail. Ms. Lyles—the Keefe employee who supplied fentanyl to Mr. Wormley before his overdose death—is just one example, and is known to have supplied drugs to at least one other detainee who overdosed. ROA.117. In another incident in 2022, an officer brought several prohibited items inside the secure area, among which were "several

---

[4] The Complaint quotes Congressman Veasey's statements from Letter of Marc Veasey, Member of Congress, to Kristen Clarke, United States Assistant Attorney General (May 23, 2024), http://veasey.house.gov/sites/evo-subsites/veasey.house.gov/files/evo-media-document/DoJ%20Letter%20Re%20Tarrant%20County%20Jail_Rep.%20Veasey.pdf.

different pills," including a prescription narcotic. *Id.* Inmates later reported that the same offer was known for "passing contraband to inmates." *Id.* Other incidents similarly confirm that prohibited items were routinely brought into the jail. ROA.117-18. Indeed, following Mr. Wormley's death, officers on the scene mentioned that his "housing unit was known for narcotic use," and inmates corroborated that they "frequently" obtained narcotics. ROA.116.

### B. Tarrant County's Responses.

Tarrant County has long been aware of the flow of illicit drugs, and other contraband, into its jail. At least as early as 2013, the Tarrant County Sheriff's Office issued a memorandum regarding unauthorized bags being brought within the secured perimeter of the jail, noting an incident in which an inmate accessed prescription medication from such an unauthorized bag. ROA.117-18. Five years later, in 2018, the Sheriff's Office issued another memorandum, acknowledging that "the introduction and movement of contraband in the secured facilities" was an issue. ROA.118. And another five years later, in 2023, the Sheriff's Office issued yet another memo, explaining that it had "observed numerous employees from all entities . . . entering the jails with unauthorized bags, phones, purses, etc." ROA.118.

Moreover, following Mr. Wormley's death, an internal investigation by Tarrant County's Criminal Investigation Division ("CID") identified at least five officers suspected of aiding inmates in smuggling drugs into Tarrant County Jail. ROA.119-20. The investigation also revealed that although there had been several reports from a

whistleblower officer regarding drugs in the jail, nothing was done in response to such reports. ROA.120. Notably, according to Texas law, the investigation following Mr. Wormley's death should have been conducted by an independent third-party, but was instead conducted internally by the Sheriff's Office. ROA.116. And the Sheriff's Office took this approach despite the fact that the CID officers assigned to conduct the investigation repeatedly informed the sheriff that they were not properly equipped or trained to perform the investigation. ROA.119.

Following the internal investigation, no arrests or meaningful policy changes were made. ROA.120-21. Indeed, at least one officer suspected to be complicit in bringing drugs into the jail—and who was named in a recent civil suit related to the death of another man who died in Tarrant County's custody—recently resigned without facing any discipline. ROA.120.

## II. PROCEDURAL HISTORY.

Plaintiffs Cassandra Johnson, Mr. Wormley's mother, and Aryanna Stafford, the mother of Mr. Wormley's minor child, filed two lawsuits based on Mr. Wormley's death against Tarrant County and Keefe, respectively. The lawsuits were consolidated below.[5] ROA.80. As to Tarrant County, Plaintiffs sought damages and a declaratory judgment under 42 U.S.C. § 1983, the Texas Torts Claims Act ("TTCA"), and the Texas Health

[5] Ms. Johnson brought claims individually and as a statutory beneficiary of the estate of Mr. Wormley, while Ms. Stafford brought claims as next friend of Mr. Wormley's minor child, M.P., who has claims both individually and as the heir and representative of Mr. Wormley's estate. ROA.108, 121.

and Safety Code ("THSC"). ROA.123-26. As to the Keefe Defendants, Plaintiffs sought damages and a declaratory judgment under theories of vicarious liability, common-law and statutory negligence, and the THSC, as well as asserting that Keefe exhibited gross negligence. ROA.126-30. Plaintiffs later opted to stop pursuing their THSC claims against all defendants. ROA.355 n.6, 365 n.20.

All Defendants moved to dismiss, and on July 11, 2025, the district court dismissed Plaintiffs' claims in their entirety. ROA.353. The court began with Plaintiffs' Section 1983 claims against Tarrant County. Assessing the claims under the framework of a conditions of confinement claim, the court noted that three elements were necessary: "(1) a rule, restriction, or an identifiable intended condition or practice, or that the jail's official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of the detainee's constitutional rights." ROA.358 (citing *Est. of Bonilla ex rel. Bonilla v. Orange Cnty.*, 982 F.3d 298, 308-09 (5th Cir. 2020)). As the court explained, the first element can be satisfied by identifying "an unstated or *de facto* policy." *Id.* However, the court explained that pursuing a conditions of confinement claim this way required plaintiffs to satisfy "a heavy burden," because plaintiffs are required to identify "sufficiently numerous prior incidents" with "similarity and specificity" to the incident at issue. ROA.359.

The court concluded that Plaintiffs had failed to meet this burden because this case involved a Keefe employee smuggling drugs into the jail, which was not sufficiently

similar to instances of "jail officers" smuggling drugs into the jail, and because "ten overdose deaths over the span of eight years" was insufficient to demonstrate "a severe and pervasive condition of detainees overdosing due to unfettered access to drugs." ROA.360-61. The court similarly rejected any *de facto* policy of failing to protect detainees with mental health concerns or from drug-associated issues, likewise concluding that the incidents highlighted in the Complaint were too few in number and were not described with sufficient specificity to support a claim. ROA.361-63. Thus, the court dismissed the Section 1983 claims against Tarrant County. ROA.364. Because the Section 1983 claims provided the only basis for federal-question jurisdiction in the case against Tarrant County, the court also dismissed the state-law TTCA claims without substantive analysis, instead declining to exercise supplemental jurisdiction over those claims. *Id.*

As to Keefe, the court first held that vicarious liability was unavailable because "selling illicit drugs is not within any of Keefe employees' scopes of employment" but that rather "the employee's work was merely a pretense to sell illicit drugs." ROA.365. The court also dismissed Plaintiffs' claims against Keefe based on direct negligence, concluding that "Plaintiffs failed to plead that Keefe knew or should have known that its employee posed a substantial risk of harm." ROA.368. In reaching this conclusion, the court did not distinguish between claims based on alleged negligent hiring, negligent retention, and negligent supervision—instead, the court reasoned that Plaintiffs' direct-liability claims were barred because Plaintiffs did "not plead that [Keefe's] employee

had previous incidents of smuggling contraband that would have caused a reasonable employer to refrain from hiring her." ROA.369. Because the court dismissed all of the negligence claims, it did not consider the gross-negligence allegations, concluding that gross negligence is not a separate cause of action but instead only a basis for enhanced damages. ROA.367-68.

## SUMMARY OF ARGUMENT

**I.** The district court dismissed Plaintiffs' Section 1983 claims against Tarrant County based solely on its conclusion that the Complaint failed to adequately allege the existence of any *de facto* policy operating to allow illicit drugs into the Tarrant County Jail. But the Complaint offers several distinct types of allegations that all corroborate the existence of such a policy, including (1) a large number of specific instances of in-custody overdose deaths, (2) statements from jail employees and inmates confirming the prevalence of illicit drugs in the jail, (3) investigatory reports detailing the scope of the problem, and (4) a pattern of policymakers turning a blind eye to reports regarding problems with drug use at the jail. Taken together, these allegations are more than enough to plausibly allege the existence of a *de facto* policy.

The district court concluded otherwise only by applying an improperly heightened standard to analyzing the Complaint and by insisting that only one specific type of allegation could suffice to show the existence of a *de facto* policy: sufficiently numerous and nearly identical prior incidents alleged in detail. No precedent supports that restrictive approach to pleading municipal liability based on a *de facto* policy,

however, and binding Fifth Circuit precedent makes clear that plaintiffs can prevail on such claims without identifying *any* other specific incidents of harm resulting from the policy. Consistent with that precedent, Plaintiffs should be permitted to pursue their Section 1983 claims in this case.

**II.** As to Keefe, meanwhile, the district court dismissed Plaintiffs' direct-liability claims based solely on its conclusion that the Complaint did not allege that Keefe knew or should have known anything about a specific employee that rendered that employee unfit for the job. While that might be an appropriate test for negligent-hiring or negligent-retention claims, however, it does nothing to resolve Plaintiffs' negligent-supervision claim. For purposes of that claim, a plaintiff need only allege that a defendant had a duty to supervise its employees, that it breached that duty, and that the plaintiff was injured as a result. The Complaint alleges just that, as it explains that Keefe knew or should have known of the risk that its employees would bring illicit drugs into Tarrant County jail, that Keefe had the ability to monitor what its employees brought into the jail, and that Keefe failed to do so, thereby allowing its employee to provide Mr. Wormley with the drugs that caused his fatal overdose.

## STANDARD OF REVIEW

This Court "review[s] orders on 12(b)(6) motions to dismiss for failure to state a claim de novo." *Armadillo Hotel Grp., L.L.C. v. Harris*, 84 F.4th 623, 628 (5th Cir. 2023) (quotation omitted). In doing so, the Court "accept[s] all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (quotation omitted). In

addition to the facts alleged in the complaint, the Court also "consider[s] all documents incorporated into the complaint by reference." *Id.* (cleaned up). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014) (quotation omitted).

## ARGUMENT

### I. PLAINTIFFS PLAUSIBLY PLEADED TARRANT COUNTY'S *DE FACTO* POLICY OF ALLOWING DRUGS INTO ITS JAIL.

To establish a Section 1983 claim against a municipality based on a condition of confinement, a plaintiff must show three elements: "(1) a rule or restriction or the existence of an identifiable intended condition or practice or that the jail official's acts or omissions were sufficiently extended or pervasive; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of a detainee's constitutional rights." *Montano v. Orange Cnty., Texas*, 842 F.3d 865, 874 (5th Cir. 2016) (cleaned up). Below, the district court addressed only the first element, finding that Plaintiffs had failed to adequately plead the existence of any policy or practice.[6]

[6] As to the second element, Tarrant County did not dispute below that a policy of permitting illegal drugs into Tarrant County Jail, or of otherwise failing to protect inmates from drug-related injuries, is unrelated to any legitimate governmental objective. It has thus waived any argument as to this element. *See, e.g.*, *Prince-Rivers v. Fed. Express Ground*, 731 F. App'x 298, 300 (5th Cir. 2018) (per curiam) ("[T]his argument was not raised below, so it is waived"). And while Tarrant County did assert below that the Section 1983 claims should be dismissed because Plaintiffs failed to sufficiently allege

That was error. The Complaint contains more than sufficient factual allegations to support the claim that Tarrant County has a *de facto* policy of allowing illegal drugs to enter its jail, including allegations that Tarrant County Jail has a higher-than-usual number of in-custody deaths, that many of those deaths have been overdoses, that internal investigations revealed the role that workers at the jail play in bringing drugs into the jail, and that no changes have been made to address the known prevalence of drugs in the jail. Rather than properly considering whether the allegations as a whole plausibly alleged a *de facto* policy, the district court applied an improperly heightened standard and fixated on a specific type of allegation in isolation. For all these reasons, the district court's decision dismissing Plaintiffs' Section 1983 claims against Tarrant County should be reversed.

### A. The Complaint Alleges Sufficient Facts To Support The Inference Of A *De Facto* Policy Of Allowing Illegal Drugs Into Tarrant County Jail.

Establishing municipal liability for a Section 1983 claim requires identifying an "official policy" that was the "moving force" behind a constitutional violation.

---

causation, its argument in support was based almost entirely on the premise that there was no *de facto* policy in the first place. ROA.149-50. Indeed, Tarrant County offered only a single sentence addressing causation as an independent basis for dismissal. *Id.* In that single conclusory sentence, however, Tarrant County offered no argument or explanation for how a policy of permitting illegal drugs to enter Tarrant County Jail could be anything other than the "moving force" behind Mr. Wormley's overdose death. *Id.* Tarrant County's cursory reference to causation is insufficient to preserve this issue for review. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) ("A party that asserts an argument . . . , but fails to adequately brief it, is deemed to have waived it.").

*Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Sometimes, such policies are "contained in duly promulgated policy statements, ordinances or regulations." *Id.* at 579. But such a formal pronouncement is not required: A *de facto* policy can also form the basis for municipal liability if it is "a persistent, widespread practice . . . which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Id.*

By definition, plaintiffs seeking to base Section 1983 claims on a *de facto* policy will not be able to point to a formal pronouncement to establish the existence of the policy. Instead, the existence of such a policy can be shown in several ways, including the types of facts pleaded here.

*First*, the existence of a policy can be shown by identifying a pattern of similar incidents. According to the Complaint, Mr. Wormley's death was one of 145 in-custody deaths in Tarrant County between 2017 and 2024, with at least 64 of those deaths in the custody of the Tarrant County Sheriff's Office specifically. ROA.111. That death toll exceeds what would be expected based on Tarrant County's inmate population. ROA.116 (incorporating by reference Letter by Marc Veasey). More specifically, Mr. Wormley's death was just one of at least *twelve* deaths known or suspected to be tied to drug use in the last several years. ROA.111-15. That so many individuals have fatally overdosed while in Tarrant County custody necessarily implies that far more inmates have used or been given access to illegal drugs over the same period; it is implausible that all (or even most) inmates given access to illegal drugs while in custody suffered a

fatal overdose as a result. This number of similar incidents thus raises a strong inference that Tarrant County has a *de facto* policy of permitting drugs into its jail.

*Second*, the existence of a policy can be shown through the statements of relevant witnesses or investigators describing the *de facto* policy. In *Montano v. Orange Cnty., Texas*, 842 F.3d 865 (5th Cir. 2016), for example, the Fifth Circuit held that "the consistent testimony of jail employees is sufficient to prove an established *de facto* policy." *Id.* at 875. There, jail employees consistently testified that although the county's written policy required them to "use a guideline of four to eight hours for detoxification," the *de facto* policy was to allow inmates to remain in isolation to detox for days on end—or "as long as it takes." *Id.* at 876. Given this testimony, "further evidence was not required for a reasonable juror to infer a *de facto* policy" contrary to the written policy. *Id.* Similarly, in *Shepherd v. Dallas County*, 591 F.3d 445 (5th Cir. 2009), the Court held that the district court properly "infer[red] a de facto jail policy" based on "a comprehensive evaluative report commissioned by the County, [a] DOJ report, [and] affidavits from employees of the jail and its medical contractor." *Id.* at 453.

This case is at a much earlier stage than *Montano* and *Shepherd*, both of which were decided after trial, but the Complaint nonetheless contains allegations that closely resemble those deemed sufficient to prove the existence of municipal liability in those cases. For example, the Complaint details jail officers' statements that Mr. Wormley's "housing unit was known for narcotic use." ROA.116. It notes that at least one officer had made numerous reports concerning drugs in the jail, but that nothing had been

done in response to those reports. ROA.120. It explains that inmates reported that they "frequently" obtained narcotics in the jail. ROA.123. It notes that an internal investigation found "that the presence of narcotics was a significant problem throughout" Tarrant County's correctional facilities—a problem so large it was beyond CID's capabilities to handle the investigation. ROA.119-20. It identified at least five officers suspected of aiding inmates with obtaining drugs in the jail. ROA.120. The report even detailed the process for how many drugs were entering—taking advantage of the attorney visitation booth's document port, "blind spots" in the jail's security cameras, and the assistance of employees at the jail who unlocked the visitation booth, allowed inmates to gather in the area, and otherwise turned a blind eye to drugs entering the facility in this way. ROA.120.

*Third*, the existence of a policy can be shown based on the official *response* to known incidents. For example, "[w]hen the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct such that a jury could conclude that it represents official policy." *Sanchez v. Young Cnty., Texas*, 956 F.3d 785, 793 (5th Cir. 2020). Similarly, "a policymaker's post-incident actions can ratify the prior misconduct." *Id.*

Here, the Complaint notes that the jail's problems with drugs were well known for years before Mr. Wormley's deaths, and that despite numerous reports from an internal whistleblower, nothing was done to address the problem. ROA.120. And after Mr. Wormley's death, the County chose to launch an *internal* investigation, rather than

enlisting an independent third-party investigator as required by law—an approach it has taken repeatedly following in-custody deaths. ROA.116. It chose this course despite the fact that its internal CID investigators "informed the sheriff that they were not properly equipped or trained to do this type of investigation as they do not ordinarily handle narcotics-related investigations." ROA.119. And it refused to provide additional resources even after CID informed the sheriff that its work on the investigation had only confirmed that the "problem was bigger" than it could handle given "the little resources and training it had." ROA.119-20. And when CID's under-resourced investigation nonetheless turned up details about the extensive problems with drugs entering Tarrant County Jail, the sheriff responded by terminating the investigation, ordering the case closed, and making no arrests or policy changes in response. ROA.120. In other words, as in *Sanchez*, even after the death at issue, "the sheriff neither punished any jailers involved nor took any action to correct the jail's alleged deficiencies." *Sanchez*, 956 F.3d at 793. These allegations, too, raise the inference that relevant policymakers acquiesced to the flow of drugs into the jail.

Each category of allegations here was sufficient to establish the existence of a *de facto* policy of allowing drugs into Tarrant County Jail. What's more, those allegations are reinforced by allegations of closely related policies with similar effects. *Cf. Sanchez*, 956 F.3d at 795 (noting that such policies should be "viewed in combination" if they have a "mutually enforcing effect"). For example, the Complaint alleges a significant number of incidents in which inmates with known mental health issues, often including

substance-abuse issues, died from suicides or drug overdoses. ROA.111-17. The Complaint also alleges many in-custody deaths of individuals who were detoxing from drugs or alcohol. *Id.* When considered in combination with other known overdose deaths and allegations regarding access to illegal drugs in the jail, these policies contribute to a picture of Tarrant County turning a blind eye to individuals who were at particular risk due to substance abuse or other mental health concerns. The existence of this general attitude toward such vulnerable inmates only serves to confirm the plausibility of a *de facto* policy permitting illegal drugs in Tarrant County Jail.

### B. The District Court's Contrary Conclusion Was Based On An Improperly Heightened Standard And Disregarded Binding Precedent.

Rather than considering all of these allegations as a whole, taken as true and viewed in the light most favorably to the Plaintiffs, as required at this stage, the district court instead applied an improperly heightened standard and unduly restricted the types of factual allegations treated as relevant.

To start, at the outset of its analysis, the district court asserted that "proving 'a pattern is a heavy burden, one that has rarely been met in [the] caselaw.'" ROA.359 (quoting *Shepherd*, 591 F.3d at 452 (brackets in original)). But while the burden of *proving* a municipal liability claim based on a pattern or practice that amounts to a *de facto* policy may be heavy, the Supreme Court has expressly rejected the idea that any heightened standard applies to *pleading* municipal liability claims. *Leatherman*, 507 U.S. at 168 (reversing the Fifth Circuit's former caselaw establishing a heightened pleading standard

for such claims). Instead, the same pleading standard applies to municipal liability under Section 1983 as to all other claims: the complaint must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Amedisys*, 769 F.3d at 320 (quotation omitted).

That standard is easily satisfied here, based on the multiple categories of mutually corroborating allegations described above. Yet the district court declined to evaluate whether all of those allegations, considered together, stated a plausible claim. Instead, the district court insisted that—regardless of what other facts are pleaded to demonstrate the existence of a *de facto* policy—pleading a *de facto* policy requires the plaintiff to identify sufficiently "numerous similar and specific prior incidents to the alleged condition and violation." ROA.359. In other words, the district court held that Plaintiffs' claims could not survive a motion to dismiss unless the Complaint identified some threshold number of other inmates suffering precisely the same fate as Mr. Wormley under precisely the same circumstances.

Binding Fifth Circuit precedent directly contradicts the district court's insistence that identifying other such incidents is the sole route to demonstrating a *de facto* policy. In *Montano*, for example, the defendant county emphasized that even at trial the "plaintiffs did not provide specific examples of other instances of detainees who suffered [the same] fate as a result of the de facto policy." 842 F.3d at 876. But, the Court explained, "such specific examples *are not required* to meet the 'condition or practice' element." *Id.* (emphasis added). That is, while "isolated examples of illness,

injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate," that rule does not invariably require plaintiffs to identify some threshold number of similar incidents to prevail on their claims, so long as there is other evidence proving the *de facto* policy.

The same was true in *Grandstaff v. City of Borger, Texas*, 767 F.2d 161 (5th Cir. 1985), where the Court noted that "[n]o incidents prior to [the incident involved in the case] were proved" at trial. *Id.* at 171. Nonetheless, the plaintiffs provided sufficient other evidence to support the existence of a *de facto* policy to prevail. *Id.* As the Court highlighted in that case, even after discovery, a Section 1983 "plaintiff may encounter difficulties" in showing "[p]rior incidents [that] tend to prove a pattern or custom and the accession to that custom by the policymaker," in light of a likely "lack of available credible witnesses and the avenues for dispute and distraction over the actual facts of each specific incident." *Id.* But a lack of evidence regarding specific incidents reflecting the policy is not necessarily fatal, because other types of evidence may "say[] more about the existing disposition of the [relevant] policymaker than would a dozen incidents." *Id.*

By the same token, the district court here should have considered all of the allegations that contributed to the plausibility of the *de facto* policy alleged, rather than focusing solely on the prior overdose deaths alleged. In refusing to do so, the district court reasoned that *Montano* is irrelevant because it was decided in the context of post-trial motions rather than evaluating the sufficiency of the pleadings. ROA.361. But there is no support for the idea that a plaintiff in a Section 1983 case is required to plead

*more* than she would be required to prove if the case went to trial. To the contrary, "[o]n a motion to dismiss, when the cause of action requires specific elements to be proven, the plausibility standard simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *Flagg v. Stryker Corp.*, 647 F. App'x 314, 315-16 (5th Cir. 2016) (quoting *In re S. Scrap Material Co.*, 541 F.3d 584, 587 (5th Cir. 2008)). In other words, plaintiffs can survive a motion to dismiss even if they clearly need discovery to develop sufficient evidence to prove their claims, as long as their allegations meet the lower standard needed to plausibly plead a claim. What was sufficient to prove a claim in *Montano* is thus more than enough to plead a claim here.

Even if the court's artificially narrow standard had been correct, however, the Complaint still satisfied it: contrary to the district court's conclusion, the Complaint did identify numerous similar and specific incidents reflecting the *de facto* policy, as detailed above. In concluding otherwise, the district court engaged in an improper divide-and-conquer analysis of Plaintiffs' allegations. The court reasoned that instances of jail officers smuggling drugs were not "similar" to a commissary employee smuggling drugs. ROA.360. This is legal error. The relevant "condition of confinement" is the insecure facility and the permissive culture regarding dangerous contraband, including illicit drugs. Whether the fentanyl enters through a guard's pocket or a commissary worker's cart is a distinction without a constitutional difference; the result is identical. By fracturing the allegations into constitutionally irrelevant sub-categories, the district

court obscured the clear pattern of security failures that Tarrant County chose to implicitly condone.

The district court's conclusion also relied heavily on a single decision from this Court, *Benfer v. City of Baytown, Texas*, 120 F.4th 1272, 1285 (5th Cir. 2024). The allegations at issue in that case, however, bear little resemblance to the allegations here. In *Benfer*, the plaintiff sought to establish a municipal policy of excessive force by "identif[ying] five instances of Baytown police allegedly using dogs to apprehend suspects impermissibly." *Id.* at 1286. But his complaint "note[d] only the existence of K-9 encounters that resulted in bites." *Id.* Without further "factual context," it was impossible to infer that those incidents involved any improper use of force or shared any other "similarity" to the incident in which the plaintiff was injured. *Id.* And even assuming those instances did involve excessive force, "[f]ive incidents of excessive force over four years in a city as large as Baytown," without more, could not establish any "pattern/custom of using police dogs to inflict injuries on non-threatening suspects." *Id.*

Here, by contrast, the "context" alleged in the Complaint does support the inference that prior overdose deaths reflect the alleged *de facto* policy. To start, while the district court suggested *Benfer* held that "five instances over five years" could not suffice to show a pattern (ROA.360), that reading of *Benfer* fails to appreciate that this Court considered the number of incidents in light of the size of the relevant population. That is, while five incidents over five years "in a city as large as Baytown" may not

reveal a pattern, *Benfer*, 120 F.4th at 1286, that does not imply that a similar rate of incidents can never establish a pattern in a smaller population, such as Tarrant County Jail.

Moreover, given the absence of any context suggesting otherwise, the alleged dog bite incidents in *Benfer* may well have reflected appropriate use of force. But incidents involving appropriate use of force could, of course, provide no support to an alleged pattern of using excessive force. In this case, by contrast, there is no appropriate access to illegal drugs in the jail setting. There is no such thing as a "lawful" fentanyl overdose or "lawful" contraband smuggling. Every instance cited in the Complaint represents a breakdown of security, making the pattern far more probative than the sporadic dog bites in *Benfer*. Indeed, the overdose deaths alleged in the Complaint reflect only the tip of the iceberg, since for every fatal overdose, there are undoubtedly many incidents in which an inmate is given access to illegal drugs in Tarrant County custody without suffering a fatal overdose as a result. Finally, while the complaint in *Benfer* offered no allegations aside from identifying five dog-bite incidents to support the existence of a *de facto* policy, as detailed above, the Complaint here offers numerous other allegations corroborating the existence of the policy at issue. *Benfer* thus does not control here.

* * *

Applying the correct standard, and considering the Complaint's allegations as a whole, Plaintiffs plausibly pleaded that Tarrant County has a *de facto* policy of permitting

drugs like those that caused Mr. Wormley's death into its jail. The district court's contrary decision should be reversed, and Plaintiffs should be permitted to pursue their Section 1983 claims against the County as a result.[7]

## II. PLAINTIFFS PLAUSIBLY PLEADED THAT KEEFE NEGLIGENTLY SUPERVISED ITS EMPLOYEES.

"To prevail on a claim for negligent supervision, a plaintiff must prove (1) the defendant owed him a legal duty to supervise its employees, (2) the employer breached the duty, and (3) the breach proximately caused the plaintiff's injuries." *Brown v. McClure*, No. 01-19-00504-CV, 2021 WL 6119990, at *8 (Tex. App. Dec. 28, 2021). As a general matter, "[a]n employer has a duty to adequately train and supervise its employees." *Black v. Smith Protective Servs., Inc.*, No. 01-14-00969-CV, 2016 WL 5400565, at *5 (Tex. App. Sept. 23, 2016). When considering a specific negligent-supervision claim, however, "[b]oth of the elements of duty and proximate cause required to establish [the] claim of negligent . . . supervision are premised on foreseeability." *Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 496 (Tex. App. 2002).

Under these standards, Plaintiffs have plainly stated a claim for negligent supervision against Keefe. As Plaintiffs pleaded, it was foreseeable that Keefe employees would smuggle contraband, including illegal drugs, into the jail; Keefe at all

[7] Because the Court dismissed Plaintiffs' state-law TTCA claims without separate analysis of those claims, instead declining to exercise supplemental jurisdiction over those claims after dismissing the Section 1983 claims, the dismissal of the TTCA claims against Tarrant County should also be reversed, and the district court should be directed to evaluate those claims on the merits in the first instance on remand.

relevant times had the ability to monitor what its employees brought into the jail; and Keefe failed to do so, allowing its employee to smuggle in the fentanyl that caused Mr. Wormley's death. No more is required to plead a negligent-supervision claim, and the district court concluded otherwise only by improperly conflating different theories of employer negligence, thereby importing requirements from other employer-negligence claims into negligent-supervision claims.

### A. It Was Foreseeable That, Absent Adequate Supervision, Keefe Employees Would Smuggle Dangerous Contraband Into The Jail.

Negligent-supervision claims turn on the foreseeability of the risk at issue. "Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others." *Black*, 2016 WL 5400565, at *5. In the employment context, a risk may be foreseeable if, among other things, "the employee is placed in a situation that foreseeably creates a peculiar risk of harm to others by reason of the employment duties" or if the employee has "potential contact with particularly vulnerable individuals." *Houser v. Smith*, 968 S.W.2d 542, 545 (Tex. App. 1998).

As the Complaint establishes, both bases for foreseeability were present here. To start, the Complaint alleges that the nature of Keefe employees' duties inherently created a peculiar risk that they would injure others by bringing drugs and other dangerous contraband into the secure facility: "those who work in state or county jails . . . are well known to bring medication or drugs into a jail." ROA.128. More

specifically, "[i]t is well known that third party vendors such as Keefe routinely bring in items that are not permitted into a jail." ROA.110. Given that Keefe "is one of the largest private providers of commissary supplies and services for jails and prisons across the country," ROA. 110, it would undoubtedly be aware that this risk is inherent in its employees' duties.

The foreseeability of harm arising from such smuggling is only heightened by the fact that many inmates are "particularly vulnerable individuals." Indeed, this Court has consistently recognized that inmates are "particularly vulnerable by virtue of [their] incarceration" and their resulting dependence upon correction officers. *United States v. Lambright*, 320 F.3d 517, 518 (5th Cir. 2003) (per curiam) (citing *United States v. Tapia*, 59 F.3d 1137, 1143 (11th Cir. 1995)). Moreover, many inmates face significant substance-abuse issues or other mental-health concerns, rendering them even more vulnerable. See ROA.111-15 (detailing these vulnerabilities for many of the individuals who have suffered in-custody deaths in Tarrant County in recent years).

Nor was Tarrant County Jail somehow an outlier, such that Keefe could have reasonably believed that its employees at Tarrant County Jail posed a lesser risk of improperly bringing drugs into the jail than generally exists for jail commissary workers. To the contrary, the Complaint makes clear that Tarrant County Jail had a widespread and longstanding problem with drugs entering the facility. *See supra* Part I.A. Given the particular facility's reputation for illicit drugs, Keefe had all the more reason to

appreciate the risk that its employees would contribute to the problem by bringing more drugs into the jail.

Moreover, Keefe was far from helpless in addressing this foreseeable risk: Keefe at all times "monitored and/or had the ability to monitor . . . what [its employees] brought into the Tarrant County Jail." ROA.128. Nonetheless, Keefe failed to sufficiently supervise its employees, allowing one such employee to bring the fentanyl into the prison that ultimately caused Mr. Wormley's death. Based on these allegations, Plaintiffs should be permitted to pursue a negligent-supervision claim against Keefe.

### B. The District Court Improperly Conflated Distinct Theories Of Liability.

Despite the above, the district court dismissed all of Plaintiffs' direct-liability claims against Keefe, including its negligent-supervision claim. In doing so, however, the court did not separately analyze each theory of direct liability. Instead, the district court dismissed Plaintiffs' direct-liability claims against Keefe solely on the basis that Plaintiffs "do not plead that [Keefe's] employee had previous incidents of smuggling contraband that would have caused a reasonable employer to refrain from hiring her." ROA.369. The court acknowledged Plaintiffs' allegation that it is "well known that third party vendors such as Keefe routinely bring in items that are not permitted into a jail," but asserted that such "general knowledge is not sufficient" because the "knowledge must be about the particular risk of harm that a particular employee creates." *Id.*

That was incorrect as to negligent supervision. While it is true that a claim for "[n]egligence in hiring or retention" requires showing something "in the employee's background that would cause a reasonable employer not to hire or retain the employee," the same is not true for a negligent-supervision claim. *See Dangerfield v. Ormsby*, 264 S.W.3d 904, 912-13 (Tex. App. 2008) (listing the relevant elements for each type of claim, and not requiring such "background" information about a specific employee for a negligent-supervision claim).

That makes sense. Where the claim is that the defendant was negligent in hiring or retaining a particular individual who caused the plaintiff's injuries, that claim can only be established by showing that the defendant knew or should have known something about that *particular* employee that rendered him unsuitable for the position. For a negligent-supervision claim, however, general knowledge of the risks posed by the type of work at issue can be enough to establish that the defendant "should have provided more . . . supervision" to *all* employees "beyond that which was given." *Id.*

Were it otherwise, the concept of negligent supervision would effectively be a dead letter—under the district court's approach, so long as an employer avoids unreasonably hiring or retaining individuals who pose undue risks in light of their backgrounds, the employer is in the clear, regardless of whether it supervises its employees at all. And that would be so regardless of how large the risks are or how easily the employer could reduce or eliminate those risks through appropriate supervision. In other words, an employer who discovered nothing troubling on a

background check could allow its employees to inflict any amount of foreseeable harm on even the most vulnerable third parties without any fear of liability.

That is not the law. To the contrary, "while it may be true that some of the elements of negligent supervision and negligent hiring claims may overlap," the fact that a defendant obtains judgment on a plaintiff's "negligent hiring claim [does] not necessarily entitle [the defendant] to . . . judgment on [the plaintiff's] negligent supervision claim." *Brown*, 2021 WL 6119990, at *9 & n.16. It is thus improper to resolve a negligent-supervision claim based solely on the resolution of a negligent-hiring or retention claim. Yet that is exactly what the district court did here.

* * *

In short, where, as here, the very nature of the employment creates foreseeable risks, the employer has a duty to supervise its employees accordingly. Plaintiffs have plausibly pleaded that Keefe's breach of that duty in this case led to Mr. Wormley's death. Their negligent-supervision claims against Keefe therefore should not have been dismissed.[8]

[8] Although the district court did not reach this issue, Keefe also argued below that the claims against it should be dismissed because Keefe's actions did not cause Mr. Wormley's death, on the theory that Mr. Wormley's voluntary ingestion of drugs breaks the chain of causation as a matter of law. ROA.171-72. But the cases Keefe cited for that proposition stand only for the rule that *unforeseeable* independent acts break the chain of causation. *See, e.g., Speer v. United States*, 512 F. Supp. 670, 679 (N.D. Tex. 1981) ("Death by self-destruction, therefore, is not a result which a pharmacist could reasonably be expected to foresee."). Texas law is clear, however, that if an "intervening cause and its probable consequences are a *reasonably* foreseeable result of the defendant's negligence, the intervening cause 'is a concurring cause as opposed to a superseding or

## CONCLUSION

This Court should reverse the district court's order dismissing the Complaint.

November 26, 2025

Respectfully submitted,

*s/ Kelly Holt Rodriguez*

Kelly Holt Rodriguez
*Counsel of Record*
JONES DAY
90 S. 7th Street
Suite 4950
Minneapolis, MN 55402
kholt@jonesday.com

Jason Burnette
JONES DAY
1221 Peachtree Street, N.E. Suite 400
Atlanta, GA 30361-3053
jtburnette@jonesday.com

*Counsel for Plaintiffs-Appellants*

new and independent cause.'" *Stanfield v. Neubaum*, 494 S.W.3d 90, 98 (Tex. 2016) (quoting *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 857 (Tex. 2009)); *see also Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex.1992) ("Although the criminal conduct of a third party may be a superseding cause which relieves the negligent actor from liability, the actor's negligence is not superseded and will not be excused when the criminal conduct is a foreseeable result of such negligence."); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 550 (Tex.1985) (criminal conduct is not a superseding cause "where the criminal conduct is a foreseeable result of such negligence"). Thus, because it was reasonably foreseeable that inmates given access to dangerous illegal drugs might overdose on them, the chain of causation is not broken. *See id.*

## CERTIFICATES OF COMPLIANCE AND SERVICE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(5)-(a)(6), (a)(7)(B), (c)(1), and Fifth Circuit Rule 32.1-32.2. Excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, the brief contains 7,805 words and has been prepared using Microsoft Word in Garamond 14-point font.

I certify that on November 26, 2025, I caused a copy of the foregoing to be served on all counsel of record via CM/ECF.

November 26, 2025

*s/Kelly Holt Rodriguez*
Kelly Holt Rodriguez
*Counsel for Plaintiffs-Appellants*